An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-169

Filed 21 January 2026

Davidson County, No. 20CVD001469-280

CARY TAYLOR, Plaintiff,

v.

VICTORIA MYERS and
CAMERON WRIGHT, Defendants,

v.

CATHY SYKES SHEPHERD and
STEPHANIE DENISE COLE, Intervenors.

Appeal by Plaintiff from orders entered 17 March 2022 by Judge Mary F. Covington and 16 January 2024 by Judge Jon W. Myers in Davidson County Superior Court. Heard in the Court of Appeals 10 September 2025.

*David A. Perez for Plaintiff–Appellant.*

*Victoria Myers and Cameron Wright, Defendants–Appellees, pro se.*

*Brinkley Walser Stoner, PLLC, by Danielle De Angelis, for Intervenors–Appellees.*

MURRY, Judge.

Cary Taylor (Plaintiff) appeals from the trial court's 17 March 2022 order allowing intervention and the subsequent 16 January 2024 order dismissing

Plaintiff's custody action and returning permanent custody of H.C.W to Defendants.[1]

For the reasons below, this Court affirms both of the trial court's orders.

## I. Background

Defendants, Victoria Myers (Mother) and Cameron Wright (Father), are the

parents of H.C.W., who was born in 2017. Defendants' relationship was "rife with

domestic violence," including Father's "physical violence" and "mental and emotional

abuse" towards Mother. At times, Father isolated Mother from her family members,

including Stephanie Cole, the maternal grandmother of H.C.W. (Grandmother), and

Cathy Shepherd, his maternal great-grandmother (Great-Grandmother).

Around May 2018, Mother hired Plaintiff to babysit H.C.W. Due to the

continuing domestic violence, Mother would sometimes ask Plaintiff "to keep" H.C.W.

for periods of time "because Defendants' housing situation wasn't safe for the child."

Although H.C.W. spent increasing time with Plaintiff, Mother continued to check in

on him, schedule and attend his medical appointments, and take him to spend time

with her family.

In April 2020, Defendants moved to Louisiana with H.C.W. for Father's

employment and for proximity to Father's family, while continuing to encourage a

relationship between H.C.W. and Plaintiff. In July 2020, Defendants agreed to allow

---

[1]   In accordance with North Carolina Rule of Appellate Procedure 42(b), we refer to the minor child
by his initials to protect his identity. *See* N.C. R. App. P. 42(b).

H.C.W. to go on a summer vacation trip with Plaintiff's family. On 15 July 2020, while H.C.W was in her physical custody, Plaintiff moved for temporary emergency custody of H.C.W., alleging that she was the child's primary caregiver. That same day, she filed a complaint for custody, alleging "upon information and belief" that Defendants had engaged in domestic violence, had no permanent residence, "were hospitalized for overuse of alcohol and drugs," and had HIV. She also alleged "upon information and belief" that Mother was diagnosed with schizophrenia and had pending criminal assault charges.

Following a hearing that same day, the trial court issued an *ex parte* order granting temporary emergency custody of H.C.W. to Plaintiff "pending further [o]rders . . . and the full hearing on the merits" of the action, which the trial court scheduled for 21 July 2020 (Emergency Order). The Emergency Order did not allow Defendants visitation rights. Because of service issues and court calendaring complications due to COVID-19, Defendants did not receive notice of the Emergency Order until 9 October 2020, and the trial court never held a full hearing on the Emergency Order. For the next two years, H.C.W. remained in Plaintiff's custody. During this time, Grandmother and Great-Grandmother visited H.C.W., including overnight visitation in Great-Grandmother's home for Thanksgiving and Christmas in 2020. The week following Christmas of 2020, Plaintiff restricted Grandmother and Great-Grandmother's visitation to situations where she was physically present.

On 24 January 2022, Great-Grandmother and Grandmother (together,

"Intervenors") moved to intervene in the child-custody action. They alleged that they were the great-grandmother and grandmother of H.C.W., that the child was "residing with a non-relative third party" and "not in an intact family," and that the matter "involve[d] allegations of unfitness . . . or constitutional rights." Intervenors also filed a complaint seeking custody of H.C.W. and a hearing on the Emergency Order, alleging that Defendants had a "history of domestic violence." Following a hearing, the trial court entered an order allowing intervention on 17 March 2022 (Intervention Order). On 3 August 2022, after a subsequent custody hearing, the trial court entered a temporary order maintaining primary physical custody of H.C.W. with Plaintiff but allowing Intervenors to have visitation with H.C.W. every other weekend. On 27 October 2022, Plaintiff, Defendants, and Intervenors entered into a consent order granting sole legal custody of H.C.W. to Intervenors and primary physical custody to Great-Grandmother, with Plaintiff exercising secondary physical custody during a weekly dinner visit and every other weekend.

After Defendants' domestic violence culminated in Father's assault of Mother, Mother obtained a domestic violence protective order against him and "extricated herself" from their relationship. She returned to North Carolina in the summer of 2023, moved into Grandmother's home, and began full-time employment. Mother reconnected with H.C.W., spending time during the week and every other weekend with him at Great-Grandmother's home. She provided "affection and care" for H.C.W., purchased items for him, and began saving money to "regain stability" as a

parent.

Between 23 August and 22 September 2023, the trial court held permanent custody hearings. Plaintiff and Intervenors were present and represented by counsel, and Mother was present *pro se*. At the hearings, Mother testified to the domestic violence in her former relationship with Father, which had isolated her from her family, and about her renewed efforts to care for H.C.W. while resuming a parental role in his life. A report from H.C.W.'s guardian *ad litem* dated 25 October 2022 was introduced into evidence. The report expressed concern that Plaintiff enabled regressive behavior of H.C.W., noting H.C.W. acted "withdrawn, timid, and clingy" in Plaintiff's presence, as if he were "a completely different child" than when he was apart from her. The report also recommended that Plaintiff "seek the assistance of a licensed therapist" to "explore the cause of [her] desire to enable and encourage [H.C.W.'s] regressive behaviors in order to understand how harmful they are for him and his overall development." Plaintiff admitted she had neither sought therapy nor changed her conduct that enabled the regressive behavior. She also testified to being fearful of allowing H.C.W. to visit with Great-Grandmother. Plaintiff further testified to hearing of instability in Defendants' relationship and erratic behavior from Mother prior to Defendants' move to Louisiana.

Following the hearings, the trial court entered an order dismissing Plaintiff's custody action and returning permanent custody of H.C.W. to Defendants (Permanent Order). The trial court found that Mother had made "quali[ta]tive

progress towards resolving issues which [had] previously hindered her from more directly asserting her [parental] role," and that Plaintiff had failed to establish Defendants' parental unfitness by clear and convincing evidence. Plaintiff timely appealed both the Intervention Order and the Permanent Order.

## II. Jurisdiction

This Court has jurisdiction to hear Plaintiff's appeal from both challenged orders because the Intervention Order "adjudicate[s] a claim for . . . child custody" and "would otherwise be a final order . . . but for the other pending claims in the same action," N.C.G.S. § 50-19.1 (2025), and the Permanent Order is a "final judgment of a district court in a civil action," *id.* § 7A-27(b)(2).

## III. Analysis

Plaintiff challenges both the Intervention Order and the subsequent Permanent Order. She claims the trial court erred (1) by holding a permanent custody hearing in 2023 because the Emergency Order had converted into a permanent order and (2) by allowing Grandmother and Great-Grandmother to intervene in this case. In the alternative, Plaintiff argues that the trial court reversibly erred by dismissing her custody action even if the Emergency Order had not "converted" into a permanent order.[2] For the following reasons, we disagree and affirm both challenged orders.

---

[2] Plaintiff contends that the trial court abused its discretion by concluding that Father and Mother were not unfit parents. Because Father is not a party to this appeal, we decline to address Plaintiff's argument regarding his parental fitness.

### A. Permanent Custody Hearings

First, Plaintiff claims that the trial court erred by holding permanent custody hearings in 2023 because the Emergency Order had "converted to a permanent order" by that time. She contends that the Emergency Order "converted to a permanent order through inactivity" because Defendants "took no action whatsoever" to challenge the trial court's order "for some 18 months after [its] entry." We disagree.

This Court reviews *de novo* whether a child-custody order is temporary or permanent. *See Brewer v. Brewer*, 139 N.C. App. 222, 228 (2000). A child custody order is temporary if "(1) it is entered without prejudice to either party"; "(2) it states a clear and specific reconvening time in the order and the time interval between the two hearings was reasonably brief; or (3) the order does not determine all the issues." *Senner v. Senner*, 161 N.C. App. 78, 81 (2003). More specifically, a child-custody order is temporary where it does not address parental visitation. *See Smith v. Barbour*, 195 N.C. App. 244, 249 (2009).

Here, the Emergency Order granted Plaintiff the "temporary exclusive care, custody, and control" of H.C.W. "pending further [o]rders of the [trial c]ourt and the full hearing on the merits" of the action. The Emergency Order specified a date for that full hearing, 21 July 2020, which was one week from the entry of the order. The Emergency Order also lacked parental visitation provisions. Thus, the Emergency Order is a temporary order.

In support of her argument, Plaintiff cites to *Lavalley v. Lavalley*, 151 N.C.

App. 290 (2002), where this Court held that a temporary custody order converted into a permanent order because the parties had failed to request a hearing on the matter "within a reasonable time" for nearly two years after entry of the order. *Id.* at 292–93. However, the order in *Lavalley* resolved all issues between the parties regarding custody, visitation, and child support, unlike the Emergency Order in this case. *Lavalley*, 151 N.C. App. at 291–92. Contrary to Plaintiff's contention, this Court has clarified that "a temporary custody order that does not set an ongoing visitation schedule cannot become permanent by operation of time." *Woodring v. Woodring*, 227 N.C. App. 638, 645 (2013)*; see In re Custody of Stancil*, 10 N.C. App. 545, 551 (1971) (quotation omitted) (A trial court "should not . . . den[y]" parental visitation rights absent "extraordinary circumstances."). Because the Emergency Order did not provide for parental visitation, operation of time alone could not convert it into a permanent order. Thus, the Emergency Order remained temporary, and the trial court did not err by holding hearings to resolve the issue of permanent custody.

## B. Intervention

Next, Plaintiff claims the trial court erred by allowing Grandmother and Great-Grandmother to intervene in this case because their pleadings were "devoid" of allegations of Defendants' parental unfitness or neglect of H.C.W. We disagree.

We review a party's standing in a child custody action *de novo*. *Wellons v. White*, 229 N.C. App. 164, 173 (2013); *see Thomas v. Thomas*, 280 N.C. App. 526, 530

(2021) ("Standing is required to confer subject[-]matter jurisdiction").[3] Our Supreme Court has recognized the constitutionally protected "paramount right of parents to custody, care, and nurture of their children." *Petersen v. Rogers*, 337 N.C. 397, 402 (1994). In child-custody actions between a parent and a non-parent, "the constitutionally-protected paramount right of parents to custody, care, and control of their children must prevail" absent a finding of parental unfitness or neglect *Id.* at 403–04. This parental custody right is a "counterpart of the parental responsibilities that the parent has assumed and is based on a presumption that . . . she will act in the best interest of the child." *Price v. Howard*, 346 N.C. 68, 79 (1997). Thus, "the parent may no longer enjoy a paramount status if . . . her conduct is inconsistent with this presumption," such as in cases of "[u]nfitness, neglect, and abandonment." *Id.*

North Carolina law allows "[a]ny parent, relative, or other person" claiming child-custody rights to "institute an action or proceeding for the custody of such child." N.C.G.S. § 50-13.1(a) (2025). Our Supreme Court has clarified that this "broad grant of standing . . . does not convey an absolute right upon every person who allegedly has an interest in the child to assert custody." *Krauss v. Wayne County DSS*, 347 N.C. 371, 379 (1997). Rather, the non-parent third party must show that she and the child

---

[3] A party may challenge the trial court's subject-matter jurisdiction "at any stage of the proceedings." *McKoy v. McKoy*, 202 N.C. App. 509, 511 (2010). Thus, we address Plaintiff's argument regarding standing on appeal despite her failure to move to dismiss Intervenors' pleadings for lack of standing at trial.

have an "established relationship in the nature of a parent-child relationship" for the third party to assert standing as an "other person" under the statute. *Ellison v. Ramos*, 130 N.C. App. 389, 395 (1998). Although the statute grants "grandparents the broad privilege to institute an action for custody," *Eakett v. Eakett*, 157 N.C. App. 550, 552 (2003), "they must still overcome the parents' constitutionally protected rights." *Thomas*, 280 N.C. App. at 531 (quotation omitted). Thus, "to survive a motion to dismiss for lack of standing, grandparents must allege both that they are the grandparents of the minor child and facts sufficient to demonstrate that the minor child's parent is unfit or has engaged in conduct inconsistent with their parental status." *Id.* The trial court must view "all factual allegations" in the pleadings "in the light most favorable to the plaintiff, granting the plaintiff every reasonable inference." *Id.* at 530–31.

Here, taking the factual pleadings in the light most favorable to them, Intervenors properly alleged Defendants' parental unfitness. Contrary to Plaintiff's assertion, Intervenors were not required to explicitly allege Defendants' parental unfitness or neglect of H.C.W. but merely to allege "sufficient" facts to show unfit parental conduct. *Id.*. at 531. From the allegations regarding Defendants' history of domestic violence, the trial court could reasonably infer that Intervenors sought to show Defendants' conduct was "inconsistent with their parental status." *Id.* By contrast, for this Court to accept Plaintiff's argument would allow a non-parent to secure standing against natural parents while denying family members from

participation in the same inquiry. This we decline to do. For the reasons above, we hold that the trial court properly allowed Grandmother and Great-Grandmother to intervene in this proceeding.

### C. Dismissal of Custody Action

In the alternative, Plaintiff claims that the trial court reversibly erred by dismissing Plaintiff's child-custody action in the Permanent Order. She asserts the trial court abused its discretion by concluding Mother was not an unfit parent. Plaintiff also contests the trial court's conclusion that Plaintiff had failed to establish by clear and convincing evidence that Mother had "acted in contradiction with her constitutionally protected rights to parent." She claims Mother abdicated her parental role by her failure to challenge the Emergency Order and her voluntary relinquishment of H.C.W. to Plaintiff's custody.[4] We disagree.

Our courts view "evidence of a parent's conduct . . . cumulatively" and "on a case-by-case basis." *Owenby v. Young,* 357 N.C. 142, 147 (2003). To overcome the parent's "constitutionally protected status," a trial court must support its determination of parental unfitness with "clear and convincing evidence." *Adams v. Tessener*, 354 N.C. 57, 63 (2001). Because the trial court has "broad discretion" in child-custody cases, we will not reverse the trial court's custody decision "absent a

---

[4]   Plaintiff also contends that Mother abdicated her parental role by failing to pay child support to Plaintiff for the care of H.C.W. Because the record is devoid of any court order requiring Mother to pay child support, we dismiss Plaintiff's argument as meritless.

clear showing of abuse of discretion." *Browning v. Heff*, 136 N.C. App. 420, 423 (2000). Thus, "the trial court's findings of fact are conclusive on appeal if there is evidence to support them, even though the evidence might sustain findings to the contrary." *Owenby*, 357 N.C. at 147. Additionally, "[u]nchallenged findings of fact are binding on appeal." *Burger v. Smith*, 243 N.C. App. 233, 236 (2015) (quotation omitted). We review *de novo* whether the findings of fact support the trial court's conclusions of law. *See id.*

Here, Plaintiff claims the trial court erred by making unsupported findings of fact regarding Mother's parenting of H.C.W. The challenged findings address Mother's active participation in parenting H.C.W. and her "progress" towards overcoming barriers that kept her from asserting her parental role. The challenged findings also document Mother's lack of intention to grant Plaintiff permanent custody of H.C.W. or to "abdicate complete responsibility" for his care.

In *Price v. Howard*, our Supreme Court recognized "circumstances where the responsibility of the parent to act in the best interest of his or her child would require a temporary relinquishment of custody" to a non-parent, citing examples such as a foster-parent arrangement, military service, or a period of illness or unemployment. *Price*, 346 N.C. at 83. To "preserve the constitutional protection of parental interests" in such a case, the Court stated that the parent "should notify" the non-parent of the temporary nature of the custody upon relinquishment. *Id.* Further, the parent "should avoid conduct inconsistent with the protected parental interests," such as

"failure to maintain personal contact with the child or failure to resume custody when able." *Id.* at 83–84.

Here, the trial court's unchallenged findings of fact show Defendants' relationship was "rife with domestic violence," including Father's "mental and emotional abuse" of Mother, "physical violence," and isolation of Mother from her family. Although H.C.W. spent a significant amount of time with Plaintiff due to safety concerns related to the domestic violence, the trial court found that Mother "maintained a relationship" with him. The trial court also found that Defendants "intended" to bring H.C.W. back with them to Louisiana after his vacation with Plaintiff's family in 2020 "but were unable to do so" due to Plaintiff obtaining emergency custody of H.C.W. Despite their separation, the trial court found Mother had "maintained contact" with H.C.W. Since her return to North Carolina in 2023, the trial court found Mother had "reconnect[ed]" with H.C.W., had "spent] as much time as she can" with him, and had "parent[ed] . . . and care[d] for" him at Great-Grandmother's home.

Based on the ongoing domestic violence in Defendants' home, Mother's decision to allow H.C.W. to accompany Plaintiff on a family vacation in 2020 was entirely consistent with her responsibility to act in the child's best interest. *Id.* at 83. Mother's agreement with Plaintiff for H.C.W. to join her for a vacation clearly notified Plaintiff of the temporary nature of Mother's relinquishment of the child. Mother maintained contact with H.C.W. throughout his time in Plaintiff's custody, and she made efforts

to resume her parental role after returning to North Carolina. Viewed cumulatively, the trial court's findings reflect a thoughtful and deliberate consideration of the evidence presented in reaching the conclusion that Mother was not an unfit parent. Thus, we hold that the trial court did not err by dismissing Plaintiff's custody action and returning sole custody of H.C.W. to Defendants.

## IV.    Conclusion

For the reasons discussed above, this Court affirms the trial court's decisions to (1) conduct the permanent custody hearings in 2023; (2) allow Grandmother and Great-Grandmother to intervene in this case; and (3) dismiss Plaintiff's custody action. Accordingly, we affirm the trial court's Intervention Order and subsequent Permanent Order.


AFFIRMED.

Judges TYSON and GORE concur.

Report per Rule 30(e).